IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

SANDRA K. NIGL,

                     Plaintiff,

      v.

CATHY JESS, MICHAEL MEISNER,
MATTHEW WALLOCK, CODY WAGNER,
DANIEL SCHROEDER, DAVID ROSS,
DEIDRE MORGAN and SANDRA HAUTAMUKI,

                Defendants.

OPINION AND ORDER

18-cv-882-bbc

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Pro se plaintiff Sandra Nigl is proceeding on claims that various officials with the Wisconsin Department of Corrections (DOC) and the Wisconsin Department of Safety and Professional Services (DSPS) violated her rights to freedom of intimate association and procedural due process under the Fourteenth Amendment when they terminated her employment and suspended her psychological license for one year. (Although plaintiff was Sandra Johnston when she filed this lawsuit, she recently married and changed her last name to Nigl.)

The following motions are before the court: (1) the motions for summary judgment filed by defendants Cathy Jess, Michael Meisner, Deirdre Morgan and Sandra Hautamauki (the DOC defendants), dkt. #95, and defendants David Ross, Daniel Schroeder, Cody Wagner and Matthew Wallock (the DSPS defendants), dkt. #96; (2) plaintiff's motion to substitute the current Secretary of DSPS, Dawn Crim, for defendant David Ross, who was the secretary during the period relevant to this lawsuit, dkt. #118; (3) plaintiff's motion for

court assistance in recruiting counsel for trial, dkt. #133; (4) plaintiff's objection to Magistrate Judge Crocker's July 27, 2020 order requiring her to sit for and cooperate with an independent psychological examination, dkt. #144; (5) defendants' motion to dismiss for plaintiff's failure to participate in an independent psychological examination, dkt. #146; and (6) plaintiff's motion to quash her deposition on the ground that someone posing as Assistant Attorney General Gesina Carson questioned her, dkt. #149.

For the reasons set out below, plaintiff's motion to substitute Crim for defendant Ross and defendants' motions for summary judgment will be granted. In light of this ruling, I will deny as moot the remaining motions: defendants' motion to dismiss the case, plaintiff's motion for court assistance in recruiting counsel for trial and plaintiff's objection to an independent psychological examination. In addition, plaintiff's motion to quash her deposition will be denied. Although plaintiff says that the woman representing defendants at plaintiff's May 12, 2020 remote video conference deposition did not look like the person depicted on the LinkedIn website for Assistant Attorney General Gesina Seiler Carson, the certified transcript of plaintiff's deposition, dkt. #85, states that attorneys Carson and Blythe appeared on behalf of defendants and asked plaintiff questions. Plaintiff's claims are unsubstantiated and would not be a ground for striking her deposition in any event, because there is no requirement that a party identify in advance which of its attorneys will conduct a scheduled deposition.

UNDISPUTED FACTS

A.  The Parties

Plaintiff Sandra K. Nigl (formerly Johnston) was initially hired as a psychologist associate by the Department of Corrections in 2011.  She received her Wisconsin psychologist license on August 4, 2014.

Defendant Cathy Jess was Administrator of the Division of Adult Institutions from February 28, 2011 to February 28, 2016; Deputy Secretary of the Department of Corrections from February 29, 2016 to June 10, 2018; and Secretary of the Department of Corrections from June 11, 2018 to January 7, 2019.  Since January 8, 2019, she has been the warden at the Oshkosh Correctional Institution.

At all times relevant to the claims in this lawsuit, defendant Deirdre Morgan was the deputy secretary of the Department of Corrections.  Defendant Michael Meisner, who is currently the warden of Fox Lake Correctional Institution, was the warden at Redgranite Correctional Institution from March 2014 to March 2020.  Defendant Sandra Hautamaki was the deputy warden at Redgranite at all times relevant to this lawsuit in 2016 and 2017.

Defendant Matthew Wallock was employed by the Wisconsin Department of Safety and Professional Services (DSPS) Division of Legal Services and Compliance at all times relevant to this lawsuit and up until September 2016.  His duties included investigating complaints filed with the agency regarding the conduct of persons in professions regulated by the various boards attached to DSPS, including the Psychology Examining Board.

Defendant Cody Wagner also was employed as an attorney with DSPS's Division of

Legal Services and Compliance and provided legal representation and counsel to the Psychology Examining Board at all times relevant to this lawsuit. His duties included prosecuting potential licensure violations and submitting stipulations and proposed orders to the board.

Defendant Dr. Daniel Schroeder was a member of the Psychology Examining Board at all times relevant to this lawsuit; he was appointed by the governor and confirmed by the state senate. His duties included signing decisions and orders issued by the board.

Defendant David Ross was the secretary of DSPS from January 2011 to December 2016. Defendant Dawn Crim is the current secretary of DSPS.

### B. Plaintiff's Employment History with DOC

Plaintiff was hired by the Department of Corrections as a psychologist associate at Kettle Moraine Correctional Institution on May 3, 2011. She began working for the Waupun Correctional Institution as a psychologist associate on April 22, 2013. At that time, she signed employee statements of acknowledgment of department executive directives, work rules, fraternization policy and employee discipline. She became a licensed psychologist in August 2014. Her duties included screening and assessing inmates' mental health, preparing case plans for and treating mentally ill inmates assigned to her caseload, monitoring inmates' progress in programs, facilitating treatment groups and referring inmates with serious mental health needs to the Wisconsin Resource Center. Plaintiff left the Waupun Correctional Institution on January 10, 2015.

On January 11, 2015, plaintiff began work at the Wisconsin Resource Center (WRC), which is managed by the Department of Health Services in partnership with the Department of Corrections to provide specialized mental health services to inmates.  Plaintiff was employed at WRC for about three months, counseling mentally ill inmates, including inmates from Waupun.  On April 17, 2015, plaintiff's supervisor, Dr. Craig Blumer, noted in her three-month probationary performance review that "[b]oth IUS and psychology staff reported instances of Dr. Johnston asking to meet with former WCI [Waupun] inmates and that following the interviews the inmates wanted only to work with Dr. Johnston."  Dr. Blumer "directed her not to see inmates from WCI" and recommended that plaintiff's probation not be continued.  Plaintiff submitted her resignation effective April 17, 2015, based on her perception of harassment by co-workers, including Dr. Blumer.  (Plaintiff says that she did not know the reason for what she calls her "forced resignation.")

Later in 2015, a colleague, Dr. Gary Ankarlo, told plaintiff about an open position with the Prison Rape Elimination Act (PREA) project, for which she was hired in July 2015. On July 3, 2015, defendant Jess confirmed plaintiff's project appointment as a licensed psychologist with DOC's Division of Adult Institutions, Bureau of Health Services, located at the central office in Madison, Wisconsin.  Plaintiff's first day of work was July 15, 2015. The position description for PREA psychologist stated in part:

> [R]esponsible for the development and implementation of training for staff involved in the intake process with close collaboration with the PREA Office. This training will focus on completing the offender victimization/perpetrator risk instrument, assigning proper housing, and doing quality assurance reviews of completed risk assessment instruments and housing assignments to ensure that appropriate services are provided to those identified as both victim and

5

perpetrator.

### C.  Plaintiff's Contacts with Inmate Nigl

Inmates are automatically assigned to a social worker and psychologist services unit staff member based on their inmate complaint number.  Department of Adult Institutions Policy and Procedure #500.30.52 regarding privacy of care defines sets forth general guidelines for clinical encounters with inmates, which are defined as "[i]nteractions between inmate patients and health care professionals that involve a treatment and/or an exchange of confidential information."  Policy and Procedure #500.70.01 related to mental health screening, assessment and referral defines "mental health caseload" as "[i]nmates classified as MH-1, MH-2a, MH-2b or ID."  The same policy defines MH-0 as no current mental health need; "[t]he inmate does not need a scheduled follow-up visit with PSU and is not seeing a psychiatrist for any reason."

Inmate Paul Nigl was confined at Waupun Correctional Institution from March 29, 2001 to September 30, 2015.  In March 2013, a psychological unit staff member classified Nigl as MH-0, no mental health need.  At that visit, Nigl reported no mental health concerns or issues to discuss.

After plaintiff began working at Waupun in April 2013, Nigl was assigned to her caseload.  Each time plaintiff spoke to an inmate on her caseload, she was required to take notes even if she did not provide the inmate any professional services.  She also spoke with inmates who were not on her caseload and made contact notes of those conversations.

6

According to plaintiff, her supervisor, Dr. Ankarlo, required her to take notes and provide diagnoses and treatment every time she spoke with an inmate, even if an inmate was not mentally ill, because he wanted to satisfy his supervisor at the central office and skew DOC statistics.  In addition, there were often "glitches" in the database, the notes would "auto-populate with inaccurate information," such as printing "ongoing psychotherapy" when that was not true.

Beginning in May 2013, plaintiff had nine recorded contacts with Nigl on the following dates:  May 17 and August 29, 2013; October 28, November 14 and 26, and December 5 and 19, 2014; and January 6 and 9, 2015.  Plaintiff made notes of each visit:

- On May 17, 2013, plaintiff changed Nigl's classification to MH-1, noting that he was seeking help with managing anxiety and stating that he would be placed on clinical monitoring.

- On August 29, 2013, Nigl reported no psychological or emotional needs and requested removal from clinical monitoring.  Plaintiff changed his classification to MH-0.

- On October 28, 2014, Nigl met with plaintiff to discuss his mother's health and requested a referral to psychiatry to get help sleeping.  Plaintiff classified him as MH-0; diagnosed him with "Other Specified Trauma- and Stressor-Related Disorder, Persistent complex bereavement disorder;" and provided active listening, empathy and CBT and dialectic techniques.  She kept Nigl on clinical monitoring.

- On November 14, 2014, plaintiff provided Nigl with active listening, empathy and CBT and dialectic techniques; kept him on clinical monitoring; and listed his classification as MH-1.

- On November 26, 2014, plaintiff reported having "ongoing psychotherapy" with Nigl; listed his diagnoses as "Other Specified Trauma- and Stressor-Related Disorder, Persistent Complex Bereavement Disorder;" provided him with active listening, empathy and CBT and dialectic techniques; kept him on clinical monitoring; and listed his classification as

7

MH-1.

- On December 5 and 19, 2014, plaintiff noted the same diagnoses, treatment, monitoring and classification as the November 26 visit.

- On January 6, 2015, plaintiff had contact with Nigl at the request of a social worker.  She noted the same diagnoses, treatment, monitoring and classification as in the previous visit.

- On January 9, 2015, plaintiff changed Nigl's diagnosis to "no diagnoses" and noted that his symptoms "no longer meet criteria for DSM-V diagnosis."  She provided active listening and empathy and CBT and dialectic techniques and changed his classification to MH-0.  Plaintiff wrote that "[h]e was able to establish a therapeutic relationship with the clinician."

See dkt. #108-1.  At the end of his last appointment with plaintiff on January 9, 2015, Nigl attempted to embrace and kiss plaintiff, but plaintiff says that she froze, said "no" and exited her office.

(Plaintiff says that after her first meeting with Nigl, she attempted to change his classification back to MH-0 and change the treatment plan to not require monitoring but the changed was not processed; she attributes this to a system malfunction.  She also says that her first two encounters with inmate Nigl were purely informational (e.g., reviewing Nigl's medical records, using scaling questions to determine whether he required any professional services); most of the remaining ones related to correctional and security issues in which plaintiff was unable to intervene; and the final conversations related to the death of Nigl's mother and plaintiff's resignation.  Plaintiff says she created a history of Nigl's informal encounters and noted diagnoses and treatment of some type to pacify her supervisors, but that she never formulated a case plan for Nigl or provided psychotherapy

8

because he was not mentally ill and had a MH-0 classification.)

On January 12, 2015, after plaintiff had left Waupun and started working at WRC, Nigl called his brother and asked him to obtain plaintiff's contact information because he was attracted to her. Plaintiff received a letter from Nigl on January 15, 2015. Nigl wanted to share religious beliefs and form an intimate relationship with plaintiff because he had fallen in love with her. He asked for plaintiff's phone number and asked her to open a phone account which she would fund. Nigl began communicating with plaintiff under the nickname Cassandra or "Cassie" Fox to protect them from harassment and retaliation from prison staff and inmates. Plaintiff sent him clothing and put money on his inmate account. Plaintiff later had intimate and sexual telephone conversations with Nigl and sent him numerous cards, letters and photographs prior to her employment with DOC's central office in July 2015. In addition, 23 photographs seized from Nigl's cell were dated September 6, 2015 and another six were date-stamped October 2, 2015. Dkt. #106-1 at 80-81. In May 2015, Nigl proposed a Hebrew marriage covenant, which plaintiff accepted. The formal covenant was signed by four witnesses in November 2015.

On September 30, 2015, Nigl was transferred to Redgranite Correctional Institution, where he remained until June 27, 2018. Since that time, Nigl has been incarcerated at the Fox Lake Correctional Institution. On November 6, 2015, plaintiff submitted a request to be placed on Nigl's approved visitors list at Redgranite, but the request was denied on the ground that plaintiff had been a DOC employee within the past 12 months. Plaintiff submitted additional requests to be placed on Nigl's visitor list in 2016, 2017, 2018 and

2019, but they were denied because she allegedly posed a safety and security threat.  Prison officials at Redgranite also denied plaintiff's December 3, 2016 request to marry Nigl.  In May 2020, DOC agreed to place plaintiff on Nigl's approved visitors list.

### D.  DOC Directives Related to Employee Relationships with Inmates

Section VIII of Executive Directive #2 states that it is a "serious act of misconduct" to fraternize with offenders, inmates or juvenile offenders by "sharing personal information, providing or receiving goods or services, displaying favoritism, engaging in a personal relationship, failing to report solicitation by an offender, inmate, or juvenile offender."

Executive Directive #16 prohibits DOC employees from having relationships with an adult or juvenile offender, including "having personal contacts or being in a social or physical relationship with an [offender]. . .  The policy prohibits personal contacts that are usually one-to-one such as dating, knowingly forming close friendships, corresponding or communicating without an exception being granted."  Dkt. 104-2.  Employees include "any person employed by the Department of Corrections, including limited term, project, and permanent employees."  Id. at 1.  Section VII.A of the directive states that to request an exception, an employee must submit a DOC 2270 form to their supervisor.  Exception requests are approved on a case-by-case basis after the supervisor and appointing authority review DOC 2270 and make recommendations.  The Division of Adult Institutions administrator makes the final decision whether to approve a DOC 2270.  Section VII.C provides that "[s]ubmission of any request for exemption does not constitute an automatic

exemption from the policy or immediate authorization for contact.  A letter from the Division Administrator will be the only authorization for exemptions."  Id. at 4.

Executive Directive #72, entitled "Sexual Abuse and Sexual Harassment in Confinement (PREA)," requires all employees to be trained in "how to avoid inappropriate relationships with offenders."  Dkt. #104-1 at 14.

According to defendants Jess and Meisner, any relationship between an employee and inmate creates a security risk for the department because the employee is privy to confidential security information.  Current and former employees have information that could enable the inmate or themselves to thwart security measures.  The more contact and communication between an employee and inmate, the more likely that sensitive information will be disclosed, even if not intentionally.  The concern of fraternization and relationship with an inmate created while the employee is employed is not only unethical, but it creates a concern for future clients and inmates.  Relationships of this nature impact staff and institutions.  It hurts the credibility of staff, the institution, and DOC as a whole.

According to defendant Jess, there have been instances in which inmates and staff have been permitted via an approved DOC-2270 form to have a relationship, but those instances have been limited to ones in which the relationship existed prior to the staff working for the DOC.  Examples of this include situations in which a father or mother works for the department and a son or daughter becomes incarcerated at another institution.

E.  Plaintiff's Termination

11

On October 23, 2015, three months after plaintiff began her employment as a PREA psychologist at DOC's central office, defendant Jess learned that plaintiff had told a co-worker at the Drug Abuse Correctional Center where plaintiff had an office that plaintiff was in a relationship with Nigl, whom she had met when she worked at Waupun. (Plaintiff is correct that the statements made by her co-worker are hearsay and not admissible for the truth of the matter asserted, but the statements are admissible to show their effect on Jess.) At that time, Nigl was incarcerated at the Redgranite Correctional Institution under the supervision of defendant Meisner. Defendant Jess was concerned, believing that a person in plaintiff's position should know the rules better than anyone. Not only would plaintiff's relationship with an inmate be an obvious violation of DOC policy but it would be a conflict of interest for her as a PREA trainer.

Defendant Jess spoke with her supervisor, defendant Morgan, and they decided to place plaintiff on paid administrative leave, according to DOC practice. In a letter dated October 26, 2015, Jess placed plaintiff on administrative leave with pay, pending an investigation.

During an interview with investigators Carpenter and Zanon on October 26, 2015, plaintiff admitted that she was in a relationship ("a courtship") with inmate Paul Nigl and said that they had communicated by phone and mail after she left Waupun. She also reported having a professional relationship with Nigl at Waupun because he was on her caseload and they had numerous clinical contacts. (Plaintiff denies having a physical relationship with Nigl at Waupun and denies ever having a therapist-patient relationship

with him.)  She told the investigators that after she left Waupun, she used a prison phone system (Securus) account under the name "Cassie Fox" to speak with Nigl.

Plaintiff told the investigators that she was aware of the directive regarding fraternization and that she attempted to submit an exception request because she had a relationship with Nigl and his family.  Under the section of the form entitled "Nature of Employee Relationship to Offender," plaintiff checked "Other–Clearly Define Relationship (explain how you met, the length of the relationship, and the purpose of the relationship)" and wrote "met at WCI approximately 04/13.  Relationship Professional."  According to plaintiff, Dr. Ankarlo angrily returned the request to her without taking any action. (Plaintiff says that because Dr. Ankarlo shut down the conversation about the form, she did not have an opportunity to discuss the seriousness of the relationship with him beyond the checked boxes.  She also claims that Dr. Ankarlo was jealous because he wanted an intimate relationship with her.).  Although plaintiff considered submitting the form to another supervisor, she did not do so.

Defendant Jess did not believe plaintiff's failed attempt to submit the form to her supervisor and the information provided in the form constituted compliance with Executive Directive #16.  According to Jess, even if plaintiff's supervisor acted incorrectly, that did not relieve plaintiff of her duty to comply with Executive Directive #16 because it was necessary for her to take additional affirmative action to obtain a letter of approval from the DAI Administrator.

With plaintiff's admission that she was in a relationship with Nigl and the results of

13

the investigation, defendant Jess believed that plaintiff had knowingly engaged in an unapproved relationship with an offender, in violation of Executive Directive #16, and decided to terminate plaintiff's project employment as a PREA psychologist.  She consulted defendant Morgan, who supported her decision.  In a letter dated October 28, 2015, Jess terminated plaintiff for alleged violations of the department's fraternization policy, effective October 29, 2015.

In November 2015, Dr. Ankarlo was the subject of a DOC employee investigation and received a written reprimand for not processing plaintiff's request for an exemption. Plaintiff filed a licensing complaint against Dr. Ankarlo in December 2015 for what she described as his repeated attempts to enter into a sexual relationship with her while he was her supervisor.

### F.  Defendant Meisner:  Investigation at Redgranite and DSPS Complaint

When the DOC receives information that a DOC employee has a relationship with an inmate, it is required to investigate.  On November 5, 2015, Steve Schueler at Redgranite reported plaintiff's conduct to Dodge County law enforcement officer, Dan Stiensma.  On November 10, 2015, Schueler opened a PREA investigation, Case No. 2953, for staff misconduct and assigned Captain Andrew Wesner as the investigator.  As part of the investigation, security staff searched Nigl's property to determine if there was evidence of a relationship.  Nigl had numerous cards and letters from plaintiff, as well as photographs of her in his cell.  As of January 12, 2015, Nigl had been in possession of plaintiff's home

address (street name and city) and called his brother asking him to look up her phone number.

The investigation revealed many phone calls between plaintiff and Nigl, beginning on January 27, 2015.  (All non-attorney inmate phone calls are recorded.)  On January 27, plaintiff and Nigl discussed several letters that had been exchanged, including a "naughty" letter, and said that they were falling in love with each other.  On January 30, 2015, Nigl placed a telephone call to plaintiff using her Cassie Fox account, which plaintiff used until February 18, 2015.  On January 31, 2015, Nigl called plaintiff, and the two discussed having "phone sex," discussed what Nigl said to her on the "last day" and to not repeat it, and what happened on the last day.  (The investigation report states that they also discussed that the event on the last day was way too brief, but plaintiff says she did not have a conversation about a "way too brief event.")  During a February 1, 2015 call, plaintiff and Nigl discussed getting married and engaged in phone sex.  On February 28, 2015, they engaged in another explicit sexual phone call.  As of November 11, 2015, there were more than 1,500 calls between plaintiff and Nigl, logging over 35,000 minutes of call time.

Captain Wesner interviewed inmate Nigl on November 10, 2015.  Nigl initiated the relationship with plaintiff by seeking her mailing address and phone number and contacting her.  Wesner ultimately found no evidence to suggest a physical relationship between Nigl and plaintiff while plaintiff was a psychologist at Waupun, but the outcome of the PREA investigation was marked as "substantiated" staff misconduct.  (Plaintiff says that she believes that defendant Meisner checked the box for "substantiated" to make her look bad

15

and have a reason to file a complaint with DSPS, but the only evidence she presents in support of this fact is her own speculation.)

Meisner contacted DSPS for advice on whether to and how to file a complaint against plaintiff. On December 8, 2015, he submitted a complaint to DSPS based on the evidence gathered during the Redgranite investigation (photos, cards, recorded phone calls, letters and admissions during interviews). On or around May 25, 2016, Meisner received a call from defendant Wallock, the DSPS investigator, asking for information from the Redgranite investigation, including telephone recordings showing that Nigl and plaintiff were still in a relationship. Meisner returned Wallock's call and the two exchanged emails, but Meisner had no further contact with DSPS regarding their investigation of plaintiff. (Plaintiff says that Meisner created an alias under the name "Wayne G" and falsely accused her of including information on her personal website that violated the stipulation that plaintiff later entered into with DSPS. However, plaintiff has presented no evidence to support this accusation apart from her own speculation.)

On September 7, 2016, Meisner received a letter stating that the DSPS investigation was complete and that plaintiff had been issued a disciplinary order. On October 31, 2016, he received a letter from DSPS stating that the case was closed for "compliance gained."

G. <u>DSPS Investigation</u>

In an email dated May 16, 2016, plaintiff asked defendant Wallock if she could bring a witness to the investigatory interview scheduled for May 27, asking "[i]s it appropriate for

me to bring a witness with me? Also, if my current supervisor would like to write a letter on my behalf (if she is not able to attend the investigation with me), who should she address it to?" Wallock responded via email, stating that "[y]ou should not bring anyone with you but I would certainly accept and pass along any letters from your supervisor." Plaintiff did not ask Wallock if she could have an attorney present and never retained an attorney during the investigation. (Plaintiff attempts to dispute this fact by saying that she understood from Wallock's statement that she could not bring anyone, including an attorney, with her to the interview. She also says that Wallock never advised her of her legal rights prior to the investigation.) At her deposition, plaintiff explained that although she consulted an attorney on one occasion, she did not retain him "because of the finances that I didn't have and because of the length of the ordeal that I was told by an attorney would take years."

Defendant Wallock conducted an investigatory interview of plaintiff for DSPS on May 27, 2016. There is an audio recording of the interview, dkt. #129, which Wallock provided to plaintiff at her request. During the interview, plaintiff admitted that during her first visit clinical contact with Nigl, she used "scaling" to make a professional determination that Nigl did not have a mental illness. Nigl also participated in "value card sorting" sessions with plaintiff for about 30 minutes to an hour during each visit. Plaintiff also admitted helping Nigl work through some family issues, which she conceded was a form of therapy.

Plaintiff told Wallock that Nigl came to speak with her every week or couple of weeks toward the end of her time at Waupun. Plaintiff also admitted sexually fantasizing about Nigl on one occasion, but she did not stop seeing him at Waupun because she thought he

had nowhere else to go and she soon would be leaving the institution.  (Plaintiff later averred that Wallock pressured her for answers during the interview and that the real reason she did not discharge Nigl is because he was not a therapy client.)  On plaintiff's last day of work (January 9, 2015), Nigl saw her about a family issue, and at the end of the session, he tried to kiss her.  (Defendants say that plaintiff admitted that Nigl kissed her, but the audio recording of the interview reveals that plaintiff twice stated that Nigl *tried* to kiss her and that if anything happened, it was brief.  Dkt. #106-3 at 1:20:20 and 1:23:28.)  She did not report the incident because she was leaving and did not think that she would see Nigl again.

Plaintiff admitted during the DSPS interview that she began exchanging phone calls and letters with Nigl during the first few weeks after she left her job at Waupun, and then began an intimate relationship with him within a few months.  In a letter dated February 8, 2015, plaintiff referred to Nigl as her husband because he had asked her if she would be in a Hebrew Covenant with him.  Plaintiff had her family sign a document for the covenant in November 2015.

During the interview, plaintiff stated that she was aware of the code of conduct that prohibited therapists from having sexual contact with a mental health client during the professional relationship and for two years after it ends, but she did not think that the rule applied in her case because Nigl was not a mental health patient.  Plaintiff also told Wallock that she did not think that her relationship with Nigl posed an ethical issue because Nigl was not mentally ill.  (Defendants say that plaintiff admitted providing therapy to Nigl while working at Waupun, but the audio recording of the interview reveals that plaintiff believed

that she provided Nigl advocacy, conversation and consultation.  Dkt. #106-3 at 1:36-38.)

Nigl wrote to Steve Englebrecht and defendant Ross and told them that plaintiff had not been in a therapist-patient relationship with him.  On June 21, 2016, Wallock spoke to Dr. Ankarlo, who stated that he supervised plaintiff at Waupun and then again at the DOC central office.  During that interview, Ankarlo stated that it would be possible to characterize meetings between a psychologist and an inmate as outside of therapist-patient relationship, depending on the circumstances of the meeting (e.g., if it was an informational meeting).  Ankarlo further stated that he "signed off" on plaintiff's notes when she was at Waupun and "recalled seeing Mr. Nigl's records and stated he would characterize Dr. Johnston's treatment as 'full psychotherapy.'"

H.  Stipulation and Final Order Suspending Plaintiff's Psychologist License

After discussing the investigation with defendant Wallock and reviewing the evidence, defendant Wagner concluded that plaintiff had violated administrative code provisions regulating the conduct of psychologists.  Specifically, Wis. Admin. Code § PSY 5.01(14) prohibits from "[e]ngaging in sexual contact, sexual conduct, kissing, or any other behavior which could reasonably be construed as seductive, romantic, harassing, or exploitative, with . . . [a] client [or a] former client within 2 years of termination of professional services."  Wis. Admin. Code § PSY 1.02 defines "client" as the "individual, group, business, agency, school, organization, or association for whom the licensee of the board provides professional services for which the licensee is usually and customarily compensated" and "includes the

term and concept of 'patient.'"

Wagner worked with Wallock and Dr. Rebecca Anderson, a member of the psychology examining board assigned to the case, to develop a settlement offer. DSPS paralegal Zachary Hendrickson drafted the stipulation and final decision and order, which Wagner edited and finalized.

On July 14, 2016, Hendrickson sent plaintiff a letter along with the proposed stipulation and final decision and order. In the letter, Hendrickson told plaintiff that "[i]f you enter into the Stipulation, your legal rights will be affected, and you should consider consulting an attorney before deciding whether to sign it," and asked her to respond by July 29 as to whether she wished to resolve the matter by stipulation. Dkt. #106-1 at 56. At the time that she received the proposed stipulation, plaintiff knew that she could consult an attorney and was aware that she could have requested a hearing from the Psychology Examining Board.

Plaintiff requested and was given a two-week extension of the July 29, 2016 deadline for letting DSPS know whether she would agree to the stipulation. On July 27, she emailed David Ross, Secretary of DSPS at that time, asking that the members of the Psychology Examining Board be given a letter from Paul Nigl, which she attached to the email. Ross forwarded the email to Michael Berndt, chief legal counsel for DSPS at that time, and sent a copy to defendant Wagner so that he could forward the letter to the board.

On August 12, 2016, plaintiff signed the stipulation and faxed it to DSPS along with a one-page letter to the Psychology Examining Board. In her letter, plaintiff stated that she

was signing the stipulation and not requesting a hearing because "I have decided that I will not be treated in a fair manner by this organization, and do not want to waste any more of my time or incur further financial obligations." Id. at 47. She also stated that "I am not doing this of my free will, but because I have been forced into this impossible position" and "Mr. Nigl was never a mental health client and is not mentally ill." Id.

Paragraph 2 of the stipulation signed by plaintiff included the following waivers of her rights:

a. the right to a hearing on the allegations against Respondent, at which time the State has the burden of proving those allegations by a preponderance of the evidence;

b. the right to confront and cross-examine the witnesses against Respondent;

c. the right to call witnesses on Respondent's behalf and to compel their attendance by subpoena;

d. the right to testify on Respondent's own behalf;

e. the right to file objections to any proposed decision and to present briefs or oral arguments to the officials who are to render the final decision;

f. the right to petition for rehearing; and all other applicable rights afforded to Respondent under the United States Constitution, the Wisconsin Constitution, the Wisconsin Statutes, the Wisconsin Administrative Code, and other provisions of state or federal law.

Paragraph 3 of the stipulation stated that "Respondent is aware of Respondent's right to seek legal representation and has been provided an opportunity to obtain legal counsel before signing this Stipulation." Paragraph 4 stated that "Respondent agrees to the adoption of the attached Final Decision and Order by the Wisconsin Psychology Examining Board (Board). The parties to the Stipulation consent to the entry of the attached Final Decision and Order

without further notice, pleading, appearance or consent of the parties. Respondent waives all rights to any appeal of the Board's order, if adopted in the form as attached."

Defendant Wagner signed the stipulation on behalf of DSPS, presented it and the proposed final decision and order to the board and recommended that the board accept the stipulation and adopt the final decision and order.  Wagner never had any direct contact with plaintiff.

On August 25, 2016, the Psychology Examining Board—including defendant Schroeder—voted to accept the stipulation and final decision and order.  Schroder reviewed and relied on the information provided by defendants Wallock and Wagner, plaintiff's letter to the board and other relevant documents.  As chair of the board, Schroeder signed the final decision and order on behalf of the board.  He never had any direct contact with plaintiff. The final decision and order stated the following findings of fact:

a.  Dr. Sandra Johnston was a licensed psychologist as of August 4, 2014.

b.  Between April 22, 2013 and January 10, 2015, Dr. Johnston was employed as a staff psychologist at a correctional institution.

c.  During this time, Dr. Johnston provided treatment to Nigl, an inmate on her caseload, on eleven dates from May 13, 2013 to January 9, 2015.

d.  On July 12, 2015, Dr. Johnston attempted to turn in a fraternization exemption form to her supervisor.

e.  The DOC conducted an investigation into Dr. Johnston's relationship with Nigl, which revealed that the first telephone call occurred on January 27, 2015 after exchanging several letters, some of which were sexual.  By the end of the phone call Dr. Johnston tells Nigl she is falling in love with him and Nigl tells Dr. Johnston he loves her.

f.  The DOC investigation found that Dr. Johnston registered an account with

22

the prison phone system under the alias "Cassie Fox," and on January 30, 2015, Nigl placed the first direct call. On February 28, 2015, Dr. Johnston and Nigl engaged in a sexually explicit conversation.

g.  The DOC investigation found Nigl was in possession of numerous cards and letters sent by Dr. Johnston, and some of the cards ended with "Sweet dreams, I love you baby," "Love Cass," "Your loving wife," "Please come home, you are my heart," "Love your wife." Several of the letters were about Dr. Johnston being able to finally openly talk about their relationship with her family, sexually explicit topics, and wanting nothing more in her life than to be Nigl's wife. Nigl also had numerous pictures of Dr. Johnston, pictures of the inside of her home, her family and of Dr. Johnston in her under garments, partially nude, and in sexually suggestive poses.

h.  On October 26, 2015, Dr. Johnston, in an interview with a DOC investigator described her relationship with Nigl as a "courtship." Respondent also admitted that she was aware of the DOC's fraternization policy and that she used the name "Cassie Fox" to hide her identity because she was "nervous at first."

i.  On May 27, 2016, Dr. Johnston admitted in an interview with a DSPS investigator that she had an ongoing romantic relationship with Nigl and he does not have a mental disorder based on her evaluation. She admitted that Nigl's visits were therapeutic in nature, but not treatment for any mental disorder. Dr. Johnston also admitted Nigl kissed her after a session on her last day and she also had at least one sexual fantasy about Nigl before leaving the institution.

j.  During the interview Dr. Johnston admitted that she received a letter from Nigl, she agreed to be in a romantic relationship with Nigl, and she used a fake identity to speak with Nigl. She admitted that she plans to marry Nigl, and she believes there is nothing unethical about her relationship with Nigl and does not believe that there is a power imbalance between them.

k.  In resolution of the matter, Dr. Johnston consented to the entry of the Conclusions of Law in the stipulation and the Order.

The final order included the following conclusions of law:  (1) "[b]y the conduct described in the Findings of Fact, Dr. Johnston, engaged in unprofessional conduct with a client in violation of Wis. Admin Code § PSY 5.01(14)(a) and (b)"; and (2) "[a]s a result

of the violations, Dr. Johnston, is subject to discipline pursuant to Wis. Stat § 455.09(1)(g)."
The order accepted the stipulation signed by plaintiff, suspended plaintiff's license for one
year, prohibited plaintiff from practicing psychology during the suspension, set conditions
to be met after the suspension and assessed costs to plaintiff in the amount of $2,332.

　　To defendant Wagner's knowledge, plaintiff never suggested, requested or proposed
any changes to the stipulation or the decision and final order.  (Plaintiff says that she
requested "advice and help from Wallock and Henderson, who dismissed her and told her
to seek legal counsel, but she does not dispute that she never requested or proposed changes
to the documents that she signed.)   Plaintiff has not fulfilled the conditions for
reinstatement of her license related to obtaining a mentor and undergoing an evaluation by
a health-care professional.

## I.　Defendant Hautamaki's Report to DSPS About Marriage Request

　　In December 2016, inmate Nigl submitted a request to marry plaintiff.  Along with
the request was a letter from plaintiff who stated that they were betrothed by a traditional
Hebrew marriage covenant as of November 2015.  She added that after one year of the
Hebrew covenant, they were free to marry.  The deputy warden, defendant Hautamaki,
contacted DSPS regarding this new information and was advised to submit a complaint to
DSPS.

　　On January 9, 2017, defendant Hautamaki completed and submitted a complaint to
DSPS.  Hautamaki later learned that DSPS screened the complaint and opened an

investigation.  DSPS investigator Alicia Nall contacted Hautamaki regarding the marriage request, and Hautamaki provided the following information:  (1) the marriage request had been denied by the warden because several conditions were not met, one being that plaintiff was not on the visiting list for the inmate; (2) an appeal of the warden's decision to deny the marriage request was filed, but unlikely to be successful because the conditions had not been met; and (3) Hautamaki would contact Nall if plaintiff was approved to be on the visitor's list or if the marriage occurred.  In a letter dated November 29, 2017, the DSPS Division of Legal Services and Compliance advised that the complaint had been investigated and the board had closed the case for insufficient evidence.  Hautamaki had no further involvement with plaintiff's licensure.  (Plaintiff says that Hautamaki contacted a DSPS monitor on August 23, 2017 to report that plaintiff's website may in violation of the stipulation, but she has not presented evidence to support this fact apart from her own speculation.  In fact, DSPS emails attached to plaintiff's affidavit show that the complaint about the website came from "Wayne G;" there is no mention of Hautamaki with respect to plaintiff's website.)

OPINION

A.  Substitution of Defendant Crim for Defendant Ross

In conjunction with her brief in opposition to defendants' motions for summary judgment, plaintiff filed a motion asking the court to substitute the current DSPS secretary, Dawn Crim, for defendant Ross under Fed. R. Civ. P. 25(d), which provides that a public officer's successor is automatically substituted as a party.  Defendants do not oppose the

motion to the extent that plaintiff seeks to dismiss all claims against defendant Ross and name Crim as a defendant in her official capacity.  Although plaintiff was given an opportunity to reply to defendants' interpretation of her request, she did not do so.  In any event, it appears that defendants have correctly interpreted plaintiff's claim against Crim.

A plaintiff may sue a state actor in his personal capacity for damages or in his official capacity for prospective injunctive relief.  Seminole Tribe of Florida v. Florida, 517 U.S. 44, 54 (1996) (Ex parte Young, 209 U.S. 123 (1908) permits federal jurisdiction over claims seeking prospective injunctive relief to remedy ongoing violation of federal law); Kentucky v. Graham, 473 U.S. 159, 165-67 and n.14 (1985); Greenawalt v. Indiana Department of Corrections, 397 F.3d 587 (7th Cir. 2005).  Plaintiff was allowed to proceed on both individual and official capacity claims that defendant Ross improperly suspended her psychological license in violation of her right to freedom of intimate association and without following procedures required under the due process clause. Dkt. #18.  However, she alleges in her second amended complaint, dkt. #41 at ¶ 12, and states in her brief in response to defendants' motions for summary judgment, dkt. #123 at 3, that she is suing Ross solely in his official capacity for purposes of injunctive relief.  Accordingly, plaintiff's motion to substitute Crim for defendant Ross will be granted.  Crim will be added as a defendant in her official capacity, and defendant Ross will be dismissed.

For the sake of completeness, I note that even if plaintiff intended to proceed on her individual capacity claims against defendant Ross, those claims fail on their merits.  Plaintiff bases her freedom of intimate association and procedural due process claims against Ross on

his failure to intervene on her behalf and find in her favor after she filed a complaint against defendant Wallock on June 15, 2016, regarding Wallock's allegedly inappropriate conduct at plaintiff's May 27, 2016 interview.  As discussed below, I find that the suspension of plaintiff's professional license did not violate her right to freedom of intimate association and that she was not denied procedural due process during the licensing investigation or suspension process.  Therefore, Ross cannot be held liable for failing to intervene to stop the suspension or correct or remedy the conduct of any other defendant.  Fillmore v. Page, 358 F.3d 496, 506 (7th Cir. 2004) ("[T]here was no constitutionally impermissible failure to intervene because there was no violation that compelled intervention."); Long v. Hammer, 2017 WL 3403796, at *7 (W.D. Wis. Aug. 8, 2017), aff'd, 727 Fed. Appx. 215 (7th Cir. 2018) ("[D]efendants cannot be liable for failing to intervene when there was no underlying constitutional violation for them to prevent.").  Moreover, defendant Ross, like the other defendants would be entitled to qualified immunity.

## B. Freedom of Intimate Association

Plaintiff was granted leave to proceed on claims that defendants took the following actions against her because of her relationship with Nigl, in violation of her right to freedom of intimate association:  (1) defendants Jess and Morgan terminated her for allegedly violating DOC's fraternization policy (Executive Directive #16); (2) defendants Wallock, Schroeder and Wagner took action to suspend her professional license for alleged violations of Wis. Admin. Code § PSY 5.01(14); and (3) defendants Meisner and Hautamaki filed

27

allegedly false licensing complaints against her under § PSY 5.01(14).

In her brief in response to defendants' motions for summary judgment, plaintiff raises an additional challenge to Executive Directive #16 as overbroad on the ground that it prohibits even prisoner-staff relationships that do not have an impact on DOC security or operations and as impermissibly vague because it fails to adequately set forth the prohibited conduct, potential disciplinary measures or guidelines for exceptions.  However, apart from requesting as relief that the fraternization policy be struck as impermissibly vague and overbroad, plaintiff did not state a constitutional overbreadth claim with respect to the policy and was not allowed to proceed on such a claim.  Therefore, I have not considered those arguments.

Moreover, as explained in more detail below, defendants are entitled to qualified immunity with respect to their actions taken pursuant to DOC's fraternization policy, which no court has found to be unconstitutionally broad or void for vagueness.  In fact, in considering the fraternization policy in a previous lawsuit in which inmate Nigl challenged the denial of his request to marry plaintiff, the Court of Appeals for the Seventh Circuit recognized that the policy "is designed to eliminate any potential conflict of interest or impairment of the supervision and rehabilitation that Department employees provide inmates."  Nigl, 940 F.3d at 330-31.  Although that case post-dates the events in this lawsuit, defendants would not have any reason to believe that they were enforcing an unconstitutionally broad policy at the time they enforced it against plaintiff.

I will address plaintiff's intimate association claims separately below.

1. <u>Applicable legal standard</u>

The due process clause of the Fourteenth Amendment protects the freedom of intimate association, which is the right to enter into and maintain certain intimate human relationships and receives protection as "a fundamental element of personal liberty." <u>Montgomery v. Stefaniak</u>, 410 F.3d 933, 937 (7th Cir. 2005) (quoting <u>Roberts v. United States Jaycees</u>, 468 U.S. 609, 617-18 (1984)).  The parties do not dispute that plaintiff's romantic relationship with Nigl qualifies for constitutional protection.  <u>See, e.g.</u>, <u>Christensen v. County of Boone, Illinois</u>, 483 F.3d 454, 463 (7th Cir. 2007)(holding that right applies whether or not participants are married).

As an initial matter, the United States Supreme Court "has limited the reach of the substantive component of the due-process guarantee to cases involving abuse of governmental power so arbitrary and oppressive that it shocks the conscience." <u>Catinella v. County of Cook, Illinois</u>, 881 F.3d 514, 519 (7th Cir. 2018).  "[O]nly the most egregious official conduct can be said to be arbitrary in the constitutional sense." <u>County of Sacramento v. Lewis</u>, 523 U.S. 833, 846 (1998).  The facts in this case are not of the type that courts have found to shock the conscience.  <u>See, e.g.</u>, <u>id.</u> at 855 (officer engaged in high-speed automobile chase with reckless indifference to life of suspect that resulted in suspect's death did not shock the conscience); <u>Christensen</u>, 483 F.3d at 465 (deputy who intentionally stalked and harassed plaintiffs specifically to interfere with their intimate relationship did not shock the conscience ); <u>Wiswell v. Abbott</u>, No. 08-3093, 2008 WL 5100471, at *2 (C.D. Ill. 2008) (assistant state attorney did not shock the conscience by

demanding that counselor terminate relationship with boyfriend as condition of being able to testify in criminal court proceedings).  Cf. Rochin v. California, 342 U.S. 165, 172-73 (1952) (recognizing conscience-shocking due-process violation involving forcible pumping of criminal suspect's stomach).  Even if unfair, defendants' alleged conduct in this case is far from conscience shocking.  Catinella, 881 F.3d at 519 (finding same in case in which county allegedly fired plaintiff and trumped up charges against him for refusing to cooperate in investigation regarding contract bidding process).

Generally, if a government policy or decision imposes a direct and substantial burden on an intimate relationship, it is subject to strict scrutiny, meaning the government must demonstrate a compelling state interest that bears a close connection to the challenged policy or decision.  Zablocki v. Redhail, 434 U.S. 374, 383-87 (1978); Montogmery, 410 F.3d at 937-38.  If the policy or decision does not impose a direct and substantial burden, it is subject only to rational basis review and will be upheld if the reviewing court finds that it rationally furthers a legitimate government interest.  Id.  The rational relationship standard is highly deferential and presumes that government actions are reasonable.

However, in cases in which a *prison* regulation or policy decision allegedly impinges on an intimate relationship, the question is whether the regulation or decision "is reasonably related to legitimate penological interests."  Turner v. Safley, 482 U.S. 78, 89 (1987); Nigl v. Litscher, 940 F.3d 329, 333 (7th Cir. 2019); Riker v. Lemmon, 798 F.3d 546, 551 (7th Cir. 2015).  See also Siddiqi v. Leak, 880 F.2d 904, 909 (7th Cir. 1989) (Turner test applies to prison policy decisions as well as prison regulations).  Recognizing that "courts are

ill-equipped to deal with the increasingly urgent problems of prison administration and reform," the Supreme Court set out "to formulate a [comprehensive] standard of review for prisoners' constitutional claims that is responsive both to the policy of judicial complaints and [to] the need to protect constitutional rights." Turner, 482 U.S. at 84 (internal citations omitted). The Court of Appeals for the Seventh Circuit has made clear that the standard is the same regardless whether the rights of prisoners or of nonprisoners are at stake. Nigl, 940 F.3d at 333 n.2 (citing Keeney v. Heath, 57 F.3d 579, 581 (7th Cir. 1995)); Riker, 798 F.3d at 552 (citing same). In Turner, the Supreme Court directed courts to consider four factors in deciding whether a prison regulation or policy decision is reasonably related to a legitimate penological interest:

1. whether there was a rational connection between the official's decision and the legitimate penological interest put forward to justify it;

2. whether alternative means of exercising the right to intimate association remained open to the plaintiff;

3. what impact accommodation of the asserted right would have on guards and other inmates; and

4. whether obvious, easy alternatives existed to accommodate the plaintiff's rights at de minimis cost to valid penological interests, tending to show that the denial was an exaggerated response to prison concerns.

Turner, 482 U.S. at 89-91.

Although the parties agree that Zablocki provides the correct standard for assessing the DSPS's enforcement of § PSY 5.01(14), they disagree about which legal standard applies to the actions taken by defendants Jess and Morgan in enforcing DOC's anti-fraternization policy. Noting that the fraternization policy is a prison-related regulation, plaintiff argues

that the Turner analysis applies to the decision to terminate her.  On the other hand, defendants contend that the Court of Appeals for the Seventh Circuit and other federal appellate courts have used the Zablocki framework to address claims brought by public employees, including corrections employees, claiming interference with an intimate association.  E.g., Montgomery, 410 F.3d 933 (probation officer terminated for purchasing car for fiancé from parolee she supervised); Keeney, 57 F.3d at 580-81 (correction officer terminated for violating anti-fraternization rule regarding marriage to inmate); Akers v. McGinnis, 352 F.3d, 1030, 1039-40 (6th Cir. 2003) (corrections employees fired for personal relationships with prisoners under fraternization policy).  In particular, defendants rely on Keeney for the view that regulations or polices that prohibit *all* inmate marriages or intimate relationships implicate an intermediate level of review under Turner, whereas only placing a burden on marriage or an intimate relationship, such as not allowing romantic relationships between employees and inmates, implicates Zablocki and a rational basis review.  However, there is no direct authority in this circuit for the distinction that defendants draw.

In Montgomery, 410 F.3d at 938, the court applied the rational basis test, but the case is not directly on point because it involved a rule prohibiting probation officers from conducting business with companies employing their probationers.  The facts in Keeney are closer to those in this case.  In Keeney, 57 F.3d at 580, the court of appeals found it significant that defendants did not forbid a correctional officer plaintiff to marry or to marry the specific inmate in question; "they merely made it more costly for her to marry him, the

cost being the loss of her job, or more precisely the loss of whatever margin made it a better job for her than any other that she could get."  The court went on to hold that prison officials could impose such a burden "only if they had some justification," but not "as much justification as they would need if, as in <u>Turner v. Safley</u>, they were actually forbidding marriage."  <u>Id.</u> at 581.  Defendants have interpreted this reasoning as support for applying a rational basis review to fraternization policies like the one at issue in this case.  However, <u>Keeney</u> does not make this distinction clear.  In fact, after making the statement above, the court cited several cases setting forth the reasonableness standard, <u>e.g.</u>, <u>Washington v. Harper</u>, 494 U.S. 210, 223 (1990); <u>Thornburgh v. Abbott</u>, 490 U.S. 401, 410 (1989), and stated that it "consider[ed] the facts of [the] case in light of that standard."  <u>Id.</u>  Although the court of appeals noted that the anti-fraternization policy was less arbitrary than the policy in <u>Turner</u>, the policy did not appear to apply a different standard.  In fact, in more recent cases citing <u>Keeney</u> as an example of the contours of an inmate's right to marry, the court of appeals has applied the <u>Turner</u> analysis without distinguishing between regulations that prohibit marriage and those that burden it.  <u>E.g.</u>, <u>Nigl</u>, 940 F.3d at 333 and n.2 (one-time denial of inmate's request to marry former prison psychologist); <u>Riker v. Lemmon</u>, 798 F.3d 546, 553-54 (7th Cir. 2015) (denial of former prison employee's request to marry inmate).  Accordingly, it would seem that <u>Turner</u> provides the appropriate standard of review for plaintiff's claims against defendants Jess and Morgan.

In any event, the dispute is not dispositive.  As discussed in further detail below, I find that plaintiff's claims against Jess and Morgan fail even under the stricter <u>Turner</u>

33

standard.  In addition, I find that all of the defendants are entitled to qualified immunity.

## 2.  Termination from DOC

Plaintiff alleges that the decision that defendants Jess and Morgan made to terminate her from DOC violated her right to intimate association with Nigl.  However, contrary to her claim, defendants' asserted reason for plaintiff's termination—violating the fraternization policy set forth in Executive Directive no. 16—is reasonably related to a legitimate penological interest, namely the safe and secure supervision and rehabilitation of inmates. See Reed v. Kemper, 673 Fed. Appx. 533, 536 (7th Cir. 2016) ("Penological interests include prison security, crime deterrence, rehabilitation, and resource allocation.").

According to the uncontradicted opinions of defendants Jess and Meisner, who are both responsible for correctional security and safety, any relationship between an employee and inmate creates a security risk for the department because the employee is privy to confidential security information, and the more contact between an employee and inmate, the greater the risk.  Similarly, the court of appeals has recognized that "[t]he Department's fraternization policy 'is designed to eliminate any potential conflict of interest or impairment of the supervision and rehabilitation' that Department employees provide inmates.'" Nigl, 940 F.3d at 331.  Further, courts must give "substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them." Van den Bosch v. Raemisch, 658 F.3d 778, 786 (7th Cir. 2011) (quoting

34

Overton v. Bazzetta, 539 U.S. 126, 132 (2003)).

Here, the undisputed facts show that after learning about a possible relationship that plaintiff was having with an inmate, defendant Jess spoke with her supervisor, defendant Morgan, and placed plaintiff on administrative leave pending an investigation in October 2015. An investigatory interview conducted by non-defendant corrections employees on October 26, 2015, revealed that plaintiff was in a romantic relationship with inmate Nigl and that they had communicated by phone and mail after she left Waupun. She also reported using the prison phone system account under an alias to speak with Nigl.

It is also undisputed that when plaintiff started working at DOC in July 2015, she submitted a request for an exemption, checking the box entitled "Other—Clearly Define Relationship (explain how you met, the length of the relationship, and the purpose of the relationship)" and noting only that "met at WCI approximately 04/13. Relationship - Professional." Her supervisor, Dr. Ankarlo, refused to process the request and was later disciplined for failing to do so. However, plaintiff did not submit an exemption request to another supervisor or otherwise alert anyone to her relationship or to Ankarlo's refusal to process her exception request at that time, choosing instead to continue an intimate relationship that violated the fraternization policy. (Plaintiff informed others of Dr. Ankarlo's violation of the policy and his alleged harassment of her, including filing a formal complaint against him, only after defendant Jess learned of plaintiff's relationship with Nigl.)

Defendants Jess and Morgan placed plaintiff on administrative leave pending an investigation. From plaintiff's admission that she was in a relationship with Nigl and the

results of the investigation, Jess believed, and Morgan agreed, that plaintiff had knowingly conducted an unapproved relationship with an offender during her employment as a PREA psychologist at the DOC central office.  Jess found that plaintiff's failed attempt to submit the form to her supervisor and the information she provided on the form did not comply with the requirements for an exception under Executive Directive #16.

Plaintiff blames the policy violation on Dr. Ankarlo, arguing that requests for exceptions must be submitted to the immediate supervisor and nothing in the policy says that the request must be submitted to another party in the event that the immediate supervisor fails to accept or process the request.  However, as defendants point out, the policy makes clear that there is "no automatic exemption from the policy or immediate authorization for contact" and that a "letter from the Division Administrator will be the only authorization for exemptions."  Contrary to plaintiff's assertion, the policy required her to obtain approval from the division administrator in order to continue her relationship with Nigl.  The fact that Dr. Ankarlo acted incorrectly did not relieve plaintiff of her duty to comply with the directive.

Citing state personnel requirements regarding employee discipline, plaintiff argues that there was no DOC 1271 investigation, that she was not provided progressive discipline and defendants failed to prepare a summary memorandum identifying disciplinary comparators showing that the infraction warranted termination.  See Purtue v. Wisconsin Dept. of Corrections, 963 F.3d 598, 600-01 (7th Cir. 2020) (describing DOC progressive discipline policy).  However, because plaintiff was a probationary and project or contract

employee without permanent status, the progressive discipline policy and procedure did not apply to her. Wis. Stat. § 230.34(1)(a) (vers. eff. Jul. 14, 2015 to Jun. 30, 2016).

Plaintiff also points to defendant Jess's admission that DOC has approved an exception for some preexisting relationships between inmates and prison employees, such as in a case in which a parent works for the department and a child becomes incarcerated at another institution. However, plaintiff did not properly request an exception, and even if she had, her situation is quite different because she did not have a relationship with Nigl that predated either her association with the department or his incarceration. Plaintiff met Nigl while she was working as a therapist at the institution in which he was incarcerated. Although plaintiff and Nigl vehemently deny entering into a romantic relationship while she was employed at Waupun, they began their relationship immediately afterwards, while she was employed at the Wisconsin Resource Center. Although plaintiff argues that all of her communication with Nigl took place "outside" of her DOC employment, the Wisconsin Resource Center is jointly managed by the Department of Health Services and the Department of Corrections to provide mental health services to inmates across the state. Moreover, plaintiff admitted to having a relationship with Nigl while she was employed at the central office and evidence collected during the Redgranite investigation confirmed that fact. For example, numerous photographs of plaintiff dated after July 2015 were found in Nigl's cell.

In any event, considering the extensive evidence regarding plaintiff's relationship with Nigl, her attempts to keep it confidential and her failure to disclose the relationship in the

manner required by department policy, a reasonable jury could not find that defendants Jess and Morgan unreasonably concluded that plaintiff violated the fraternization policy or that their decision to terminate her was exaggerated under the circumstances. Executive Directive #2 states that fraternization with offenders, including sharing personal information, providing or receiving goods or services, displaying favoritism, engaging in a personal relationship and failing to report solicitation by an offender are serious acts of misconduct that can result in termination. "Taking steps to [stop and] prevent this type of conduct from recurring in the future is rationally related to defendants' interests in maintaining a secure prison capable of effectively monitoring inmate contacts and in promoting respect for its rules." Nigl, 940 F.3d at 334-35 (finding same with respect to warden's decision to deny Nigl's one-time request to marry plaintiff).

Plaintiff also cannot satisfy the remaining Turner factors. Contrary to plaintiff's assertion, the fraternization policy does not place a complete ban on all of plaintiff's intimate relationships or prohibit her from having relationships with a large percentage of the population. Keeney, 57 F.3d at 580 (fraternization policy provides very minimal interference to employee relationships). Alternative means of exercising her right to intimate association remained open to plaintiff because she could have properly notified her superiors by submitting a request for an exception, and if the request had been denied, she could have chosen to find new employment. Plaintiff argues that neither Jess nor Morgan offered her the choice to give up Nigl or give up her job, but she had been violating the policy for several months by the time they learned about her relationship and decided to terminate her.

38

Plaintiff also suggests that Jess could have transferred Nigl, but it is not clear how moving Nigl from Redgranite to another institution within the DOC would address the valid penological interests at stake.  Plaintiff was a PREA psychologist in the central office working on a project that affected all of DOC's institutions.

In any event, even if defendants could have taken other actions to deal with plaintiff's relationship or sanction her, Turner does not impose a least restrictive alternative test, and defendants are entitled to substantial deference in determining the most effective means of accomplishing their legitimate penological goals.  Nigl, 940 F.3d at 335.  As discussed above, accommodating plaintiff's right to be in an intimate relationship with Nigl while she was employed would pose security risks and negatively affect the supervision and rehabilitation of inmates.  Plaintiff has not shown that any obvious or easy alternative existed to accommodate her right that would have posed only a de minimis cost to the valid penological interests of the department.  Accordingly, defendants Jess and Morgan are entitled to summary judgment with respect to plaintiff's claim against them.

3.  DSPS enforcement of licensing regulation

Plaintiff argues that the DSPS defendants (Wallock, Wagner and Schroeder) directly and substantially interfered with her right to associate intimately with inmate Nigl when they enforced Wis. Admin Code § PSY 5.01(14) against her, subjecting their actions to strict scrutiny under Zablocki, 434 U.S. at 383-87.  I disagree in both respects.

Section PSY 5.01(14) provides that complaints regarding engaging in romantic or

39

sexual conduct with a former client within two years of termination of the professional relationship shall be investigated and lead to disciplinary proceedings.  See also Wis. Stat. § 455.09(1)(g) (examining board may suspend a license for up to one year for violation of rule of professional conduct).  Although the regulation has an incidental effect on certain intimate relationships for a limited period of time, it does not prohibit all relationships or target or penalize a person's fundamental interest in intimate association.  Cf. Zablocki, 434 U.S. at 387 (requirement that non-custodial parents obtain court permission before any remarriage is direct and substantial interference); Loving v. Virginia, 388 U.S. 1 (1967) (total ban on marriage outside one's ethnic group is direct and substantial interference).  As the Court of Appeals for the Seventh Circuit has made clear, "[t]he Constitution prevents fundamental rights from being aimed at; it does not, however, prevent side effects that may occur if the government is aiming at some other objective."  Christensen v. County of Boone, IL, 483 F.3d 454, 463 (7th Cir. 2007).  Therefore, plaintiff's claim is subject to a rational basis review.

The rational relationship standard is highly deferential and presumes that government actions are reasonable.  The Psychology Examining Board's rules of professional conduct, which include § PSY 5.01, further a legitimate government interest, namely protecting the health, safety and welfare of clients or patients.  Nigl, 940 F.3d at 331 (noting purpose of rule); Bar-Av v. Psychology Examining Board, 2007 WI App 21, ¶ 11, 299 Wis. 2d 387, 399, 728 N.W.2d 722, 728 (same).  In this case, the undisputed facts show that the DSPS defendants responded to a complaint that plaintiff had entered into a romantic relationship

40

with an inmate to whom she had provided professional services while employed as a prison psychologist.  DSPS conducted an investigation that revealed that inmate Nigl had been assigned to plaintiff's caseload at Waupun, that plaintiff had met with him on nine occasions for which she had generated clinical contact notes and that the two had developed an ongoing romantic relationship very soon after plaintiff left Waupun (i.e., within the two year period prohibited by the regulation).  Plaintiff's clinical notes discussed Nigl's mental health classification, diagnoses and treatment.  During the investigatory interview, plaintiff also admitted that she had used techniques like "scaling" and "value card sorting" during some of those visits and had helped Nigl work through some family issues, actions that a reasonable jury could find to be evidence of a professional relationship.  Therefore, defendants' investigation of plaintiff's conduct and the steps they took address it were consistent with the stated purpose of the rule and rationally related to their interest in protecting the safety and welfare of clients receiving psychological services at the prison.

Plaintiff devotes a large section of her brief to explaining away the contents of her notes and their significance and generally contradicting the findings of DSPS.  Specifically, she argues that her relationship with Nigl was permissible under the administrative code because he was never really her patient or client, he was not mentally ill and prison psychology is different than other forms of practice because the therapists can meet with inmates for informational or other reasons.  For example, she points out that Nigl was often classified as MH-0, or not mentally ill, and therefore would not be on a mental health caseload or require follow up in the psychological services unit per DOC policy.  Plaintiff

contends that Nigl did not meet the American Psychological Association's definition of "client," which is "a person receiving treatment or services, especially in the context of counseling or social work." She also argues that she did not provide him with "psychotherapy" as that term is defined under Wisconsin law: "the use of learning, conditioning methods and emotional reactions in a professional relationship to assist persons to modify feelings, attitudes and behaviors which are intellectually, socially or emotionally maladjustive or ineffectual." Wis. Stat. § 455.01(6).

However, even if plaintiff's points can be considered valid, these arguments are not dispositive of her constitutional claim. As discussed at length in conjunction with her procedural due process claim below, plaintiff signed a stipulation and final decision and order, which found as fact that she provided treatment to Nigl, an inmate on her caseload, on eleven dates from May 13, 2013 to January 9, 2015. If plaintiff believed that she did not violate the administrative code, her recourse was to proceed to a hearing at which she could make a formal record and challenge the validity of the rule and then appeal any adverse decision. Wis. Stat. §§ 227.40(2) (vers. eff. Mar. 2, 2016 to Dec. 15, 2018), 227.42(1) (vers. eff. Apr. 1, 2014 to Jun. 30, 2018) and 227.52 (vers. eff. Jun. 30, 2016 to Nov. 26, 2019). Plaintiff chose not to do any of these things and signed the stipulation presented to her without proposing any modifications. Accordingly, defendants Wallock, Wagner and Schroeder are entitled to summary judgment with respect to plaintiff's intimate association claims.

42

4.  Filing of licensing complaints

Plaintiff alleges that defendants Meisner and Hautamaki filed licensing complaints against her in an effort to prevent her visitation with and marriage to Nigl.  As an initial matter and for the reasons explained above, the enforcement of Wis. Admin. Code § PSY 5.01(14) does not interfere directly or substantially with plaintiff's right to intimate association and is rationally related to a legitimate government interest.  It follows, therefore, that reports or complaints filed pursuant to that rule do not burden plaintiff's right to intimate association.

Although plaintiff contends that Meisner and Hautamaki "had it in for her" and retaliated against her for exercising her constitutional right to intimate association, she presents no evidence in support of these contentions apart from her and Nigl's speculation about defendants' motives and what she considers to be suspicious timing between defendants' reports and the visitation and marriage requests.   As discussed below, defendants' actions were consistent with the stated purpose of the rule and reasonably related to legitimate government interests.  (Plaintiff cites the standard for First Amendment retaliation claims regarding protected speech.  E.g., Mount Healthy City School District Board of Education, 429 U.S. 274 (1977); Kidwell v. Eisenhower, 679 F.3d 957, 964-65 (7th Cir. 2012).  However, plaintiff was not allowed leave to proceed on a First Amendment retaliation claim.  As explained in this court's screening order, the First Amendment does not apply to claims alleging a violation of the right to intimate association.  Dkt. #18 at 7).

Defendant Meisner's only involvement with plaintiff was to institute the investigation

43

conducted by Wesner at Redgranite, which located evidence in Nigl's cell and prison phone records that showed substantial and intimate contact between plaintiff and Nigl soon after she left Waupun.  Although there was no evidence that plaintiff had a physical relationship with Nigl at Waupun, the evidence showed that she began a romantic relationship with him very soon after she left the institution.  On the basis of the evidence gathered during the investigation, Meisner believed that plaintiff had acted inappropriately as a therapist and possibly in violation of her license.  Thus, on December 8, 2015, he submitted a complaint to DSPS, which ultimately led to the suspension of plaintiff's license in August 2016.  After plaintiff requested approval to marry plaintiff in December 2016, defendant Hautamaki, Meisner's deputy warden, contacted DSPS about the request and was advised to submit a complaint.  She completed and submitted a complaint to DSPS on January 9, 2017.

Whatever Meisner and Hautamaki may have thought of plaintiff personally or of her relationship with Nigl, these defendants had reasonable and justifiable grounds to make a report to DSPS.  Plaintiff had been assigned as Nigl's therapist and there was tangible evidence (photographs, letters and telephone conversations) that plaintiff and Nigl had entered into a romantic relationship at least by the end of January 2015.  As officials responsible for the safety of inmates and the overall security of the prison, it would be within their duty to report suspected misconduct by a prison psychologist.  Further, DSPS and not DOC has the authority to investigate complaints and issue sanctions regarding psychological licenses.  Neither Meisner nor Hautamaki had the authority to determine whether plaintiff had provided professional services to plaintiff or to decide whether her license should be

44

suspended.  Accordingly, both defendants of these defendants are entitled to summary judgment with respect to plaintiff's claims against them.


## C.  Procedural Due Process

The parties agree that plaintiff had a constitutionally protected property interest in maintaining her psychological license and cannot be deprived of that interest through a disciplinary sanction without due process.  Simpson v. Brown County, 860 F.3d 1001, 1006 (7th Cir. 2017) ("Government-issued licenses to perform certain types of work that allow the license holders to earn their livelihoods are a form of government-created property."); Abcarian v. McDonald, 617 F.3d 931, 942 (7th Cir. 2010) (discussing physician's property interest in blemish-free medical license); Fleury v. Clayton, 847 F.2d 1229, 1232 (7th Cir. 1988) (property interest in medical license).  Due process "is flexible and requires only such procedural protections as the particular situation demands."  Riano v. McDonald, 833 F.3d 830, 834 (7th Cir. 2016) (citation and quotation marks omitted).  "The cornerstone of due process is notice and the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  Grant v. Trustees of Indiana University, 870 F.3d 562, 571 (7th Cir. 2017) (quoting Mathews v. Eldridge, 424 U.S. 319, 333 (1976)).  "Many state and local licensing schemes provide procedural protections that are far more elaborate than due process requires."  Simpson, 860 F.3d at 1006.

When faced with a deprivation of employment opportunities or termination, public employees are "entitled to notice of the charges against [them], an explanation of the

employer's evidence, and an opportunity to present [their] side of the story." Cleveland Board of Education v. Loudermill, 470 U.S. 532, 546 (1985).  While some pre-termination hearing is necessary, it need not be elaborate.  Id. at 545 ("In general, 'something less' than a full evidentiary hearing is sufficient prior to adverse administrative action.") (quoting Mathews, 424 U.S. at 343)).

In this case, plaintiff was provided notice of the charges against her and an opportunity to present her side of the story during a three-hour interview.  She also was offered the opportunity to proceed with a formal hearing process, but she chose to waive that right by signing a stipulation agreeing to a one-year suspension of her license.  Plaintiff agrees that she was provided timely and adequate notice, but she argues that defendant Wallock did not allow her to bring an attorney to the investigatory interview, did not provide her discovery or the right to inspect the state's evidence (in particular, inmate Nigl's psychological records) at the interview, was biased against her because he refused to accept her answers for what they were and coerced her into signing the stipulation because he threatened harsher penalties if she contested the discipline.  Plaintiff's claims against defendant Schroeder and Wagner (and previously, Ross) are based on her contention that these defendants should have known about Wallock's conduct because of the complaint she made to Ross, but that they failed to intervene to stop or prevent it.

As evidence that Wallock denied her any legal representation at the interview, plaintiff points out that in response to her email asking about bringing her supervisor as a witness, Wallock stated that she should not bring anyone with her.  However, plaintiff did

not ask Wallock whether she could bring an *attorney* with her to the interview or consult with one during the interview, and a reasonable jury would not conclude from Wallock's response to her general question about witnesses that he was denying her legal representation.  In any event, the due process clause does not guarantee plaintiff the right to counsel at an investigatory administrative proceeding.  Even indigent plaintiffs have "no right to appointed counsel or other free legal advice in civil litigation, let alone in civil administrative proceedings."  Fleury, 847 F.2d at 1233.  See also Hannah v. Larche, 363 U.S. 420, 442-43, 446 (1960) (no constitutional right to counsel in non-adjudicatory fact-finding inquiry conducted by federal agency).  Further, plaintiff was informed of her right to consult an attorney when she was presented with the draft stipulation.  Although she says that she could not afford an attorney, defendants had no duty to provide one for her and did not prevent her from seeking legal counsel.

Plaintiff says that just prior to the investigatory interview, she asked Wallock for an opportunity to view the evidence against her.  In response to plaintiff's interrogatories, Wallock said that he did not recall plaintiff making such a request but that he probably would have denied it because in his experience, providing subjects of an investigation with the evidence in advance provides them with an opportunity to craft misleading responses. He would have been free to do so because, under Wisconsin law, the state is not required to release investigatory documents during the course of an investigation.  Wis. Stat. § 19.36(10)(b) (setting out limitations on access to or disclosure of records  and specifying that there is no access to employee of "[i]nformation relating to the current investigation of

a possible criminal offense or possible misconduct connected with employment by an employee prior to disposition of the investigation."); Kroeplin v. Wisconsin Department of Natural Resources, 2006 WI App 227, ¶ 31, 297 Wis. 2d 254, 276, 725 N.W.2d 286, 296-97 ("Wisconsin Stat. § 19.36(10)(b) codifies common law standards and continues our tradition of keeping records related to misconduct investigations closed while they are ongoing."). See also Hannah, 363 U.S. at 445-46 ("[W]hen [administrative regulatory] agencies are conducting nonadjudicative, fact-finding investigations, rights such as apprisal, confrontation, and cross-examination generally do not obtain."). Plaintiff has cited no authority for the view that her procedural due process rights included having access to the evidence against her during the state's initial investigatory interview, before the case moved forward to the hearing stage. Moreover, plaintiff does not say that she made any other request to view the evidence against her or to exercise her right to a formal hearing prior to signing the stipulation in which she waived those rights. Had plaintiff requested a hearing, she would have had the right to appear with or without counsel, present and rebut evidence, engage in discovery, subpoena and cross examine witnesses and present oral and written arguments. Wis. Stat. §§ 227.44 and 227.45.

Plaintiff also takes issue with what she considered coercive pressure from Wallock while questioning her during the interview and later presenting the stipulation. However, even if Wallock repeatedly asked plaintiff the same questions in an attempt to discern what he may have considered to be the true answer, plaintiff had an opportunity to answer his questions and present her side of the story. In fact, a review of the audio recording of the

interview, dkt. #129, reveals that Wallock did not act in an obviously aggressive manner, raise his voice or badger plaintiff with questions.  See Scott v. Harris, 550 U.S. 372, 380-81 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record [in this case a videotape], so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). Wallock gave plaintiff ample time to provide an answer or clarify her response.  From the record before the court, a reasonable jury would not conclude that Wallock intimidated or coerced plaintiff during the interview.  If, as plaintiff contends, she believed that Wallock did not accept her answers and had already made up his mind that she was guilty, her recourse was to proceed to a hearing at which she could make a formal record, challenge the validity of the rule and appeal any adverse decision.  Wis. Stat. §§ 227.40(2) (vers. eff. Mar. 2, 2016 to Dec. 15, 2018), 227.42(1) (vers. eff. Apr. 1, 2014 to Jun. 30, 2018) and 227.52 (vers. eff. Jun. 30, 2016 to Nov. 26, 2019).  Plaintiff chose not to do any of these things and signed the stipulation presented to her without proposing any modifications.

Although plaintiff says that she felt she had no choice but to sign the stipulation or face harsher punishment, the Court of Appeals for the Seventh Circuit has rejected similar arguments, holding that "[a]n overbearing attorney does not violate the Due Process Clause by stressing the grave consequences that may attend failure to bargain."  Fleury, 847 F.2d at 1233 (rejecting arguments that Board's attorney violated plaintiff's due process rights by threatening revocation or suspension of medical license unless plaintiff consented to censure and not informing plaintiff of procedural rights under state law).  As the court of appeals explained in Fleury:

> The opportunity for a hearing is due process of law. If Fleury did not like the attorney's offer, he had only to stand on his rights; if he thought that the Board would disregard the evidence, he still had to make his record and obtain review in state court if his fears should be realized. An attorney need not inform the adverse party of his procedural rights.

Id.

I conclude, therefore, that plaintiff has failed to show that defendant Wallock violated her right to procedural due process.  I further conclude that because there was no underlying constitutional violation for them to prevent or stop, defendants Schroeder and Wagner cannot be held liable for failing to intervene.  Fillmore, 358 F.3d at 506; Long, 2017 WL 3403796, at *7.  Therefore, defendants Wallock, Schroeder and Wagner are entitled to summary judgment with respect to plaintiff's procedural due process claim against them.


D.  Qualified Immunity

Government officials are entitled to qualified immunity unless their conduct violated a federal statutory or constitutional right, and the unlawfulness of their conduct was "clearly established at the time." D.C. v. Wesby, 138 S. Ct. 577, 589 (2018).  The doctrine protects government officials from damages liability "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Campbell v. Kallas, 936 F.3d 536, 545 (7th Cir. 2019) (quoting Estate of Clark v. Walker, 865 F.3d 544, 549-50 (7th Cir. 2017)).  The inquiry is two-fold: "(1) whether the facts, taken in the light most favorable to the plaintiff[], show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly

50

established at the time of the alleged violation." Gonzales v. City of Elgin, 578 F.3d 526, 540 (7th Cir. 2009). Whether a right was "clearly established" is grounded in the notion of fair notice. Thus "[a] rule is too general if the lawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" District of Columbia v. Wesby, __ U.S. __, 138 S. Ct. 577 (2018) (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987)). The Court of Appeals for the Seventh Circuit recently reminded courts that "clearly established law cannot be framed at a 'high level of generality.'" Campbell, 936 F.3d at 545 (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). Rather, "[e]xisting caselaw must dictate the resolution of the parties' dispute," meaning that the "precedent must have placed the . . . constitutional question beyond debate." Id. Accordingly, courts must "[f]rame the constitutional right in terms granular enough to provide fair notice." Id.

Although qualified immunity is an affirmative defense, once defendants raise it, "the burden shifts to the plaintiff to defeat it." Leiser v. Kloth, 933 F.3d 696, 701 (7th Cir. 2019). Although plaintiff cites several cases in support of her argument that her rights to intimate association and procedural due process are well-established, she has not identified any cases that would support a freedom of association or procedural due process claim under circumstances similar to those in this case, and I have found none.

With respect to her intimate association claims, plaintiff cites Keeney, 57 F.3d 579; Via v. Taylor, 224 F. Supp. 2d 753 (D. Del. 2002); and Corso v. Fisher, 983 F. Supp. 2d 320 (S.D.N.Y. 2013), for the view that DOC's fraternization policy clearly would not apply

51

under circumstances present in this case.  However, these cases do not assist plaintiff because they are either not binding on this court or they are distinguishable from plaintiff's case on their facts.  As discussed above, in <u>Keeney</u>, 57 F.3d at 580, the court of appeals held that it was *not* unconstitutional for prison officials to force a correctional officer to choose between the loss of her job and her relationship with an inmate pursuant to a fraternization policy. In <u>Via</u>, 224 F. Supp. 2d at 762, the court found that a conduct code prohibiting off-duty relationships with both incarcerated and non-incarcerated offenders was not substantially related to the state's interest in the orderly functioning of prisons, the holding is not binding on this court and involved the termination of a correctional officer in a relationship with a *former* inmate.  Finally, the decision in <u>Corso</u>, 983 F. Supp. 2d at 326-27, is not binding on this court and even if it were, it involved a claim that a fraternization policy was unconstitutionally overbroad, not the claim at issue in this case.

Plaintiff has failed to identify any legal precedent that would have prohibited the DSPS defendants from suspending the license of a psychologist pursuant to a licensing regulation under the circumstances of this case.  In addition, the only case that plaintiff cites with respect to her procedural due process claim is <u>Mathews v. Eldridge</u>, 424 U.S. 319, 349 (1976), which involved Social Security benefits and held that an evidentiary hearing is not required prior to the termination of disability benefits.

Because plaintiff has failed to meet her burden of showing that authoritative precedent had put it beyond debate that defendants' particular conduct in enforcing DOC's fraternization policy and state licensing requirements for psychologists would violate her

52

general rights to intimate association and procedural due process, defendants are entitled to qualified immunity.

ORDER

IT IS ORDERED that

1.  Plaintiff Sandra Nigl's motion to substitute Dawn Crim for defendant David Ross with respect to the official capacity claim against Ross, dkt. #118, is GRANTED.  Dawn Crim is ADDED as a defendant, and defendant Ross is DISMISSED.

2.  Plaintiff's motion to quash her deposition, dkt. #149, is DENIED.

3.   The motions for summary judgment filed by defendants Cathy Jess, Michael Meisner, Dede Morgan and Sandra Hautamauki (the DOC defendants), dkt. #95, and defendants Dawn Crim, Daniel Schroeder, Cody Wagner and Matthew Wallock (the DSPS defendants), dkt. #96, are GRANTED.

4.  Defendants' motion to dismiss, dkt. #146; plaintiff's motion for court assistance in recruiting counsel for trial, dkt. #133; and plaintiff's objection to the court's July 27, 2020 order, dkt. #144, are DENIED as moot.

5.  The clerk of court is directed to enter judgment in favor of defendants and close this case.

Entered this 29th day of September, 2020.

BY THE COURT:
/s/
_____

BARBARA B. CRABB
District Judge